UNITED STATES COURT OF APPEALS FOR
THE DISTRICT OF COLUMBIA CIRCUIT

NO. 13-7022

NORMAN WILLIAMS and DIANE HOWE,
As Legal Representatives of J.H.,

Appellants

v.

ROMARM, SA and DOES COMPANY
DISTRIBUTORS,

Appellees.

ORAL ARGUMENT NOT YET SCHEDULED

On Appeal from the United States
For the District of Columbia, Civil

Hon. Emmet G. Sullivan

**APPELLANTS' CORRECTED BRIEF**

Daniel Wemhoff, Esq. #420233
4600 S. Four Mile Run Dr. #831
Arlington, VA 22204
(703) 589-2199
e-mail: danwem@yahoo.com
*Counsel for Appellants*

August 7, 2013

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

The following list includes all parties who appeared in the District Court. The listed Plaintiffs-Appellants and Defendants-Appellees are parties to this appeal.

### 1. Parties

Plaintiffs-Appellants are Norman Williams and Diane Howe, Legal Representatives of J.H. Defendants-Appellees are ROMARM, SA and "DOES Company Distributors", the latter have made no appearance in this case.

### 2. Rulings under Review

Plaintiffs-Appellants are appealing from a Memorandum Opinion of District Judge Emmet Sullivan, entered on February 4, 2013, dismissing Plaintiffs-Appellants case on Defendant's-appellant's motion. Notice of Appeal was filed on February 7, 2013.

The Memorandum Opinion appears on the district court's docket as entry No. 23. There is no citation known.

### 3. Related cases

An earlier version of this case was filed in the Superior Court and removed here.

It was then voluntarily dismissed by the Plaintiffs-Appellants before any action was taken by the district court in order to take advantage of Emergency legislation extending the statute of limitations Wrongful Death Act claims in the District of Columbia from one (1) to two (2) years. It was then refiled here on March 20, 2012.

i

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES .... i

TABLE OF AUTHORITIES ...................................................iv,v

GLOSSARY OF ABBREVIATIONS ................................. vi

STATEMENT OF SUBJECT MATTER AND APPELLATE ..................

JURISDICTION ................................................................ 1

STATEMENT OF THE ISSUES ..................................................... 2

STATEMENT OF THE FACTS .................................................. 3,4

SUMMARY OF THE ARGUMENT .............................................. 5-7

RULE 32 CERTIFICATION ......................................... 8

ARGUMENT .................................................................. 9

   I.  BACKGROUND ................................................... 9

  II.  THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA ERRED BY GRANTING DEFENDANT'S-APPELLEE'S MOTION TO DISMISS BASED ON LACK OF PERSONAL JURISDICTION WHICH AS AN ISSUE OF LAW IS REVIEWED HERE *DE NOVO*. ...........................................10

     A. PLAINTIFFS'-APPELLANTS' BORE ONLY A *PRIMA FACIE* BURDEN TO SHOW PERSONAL JURISDICTION DUE TO THE LACK OF AN EVIDENTIARY HEARING AND DENIAL OF THEIR ATTEMPTED LIMITED JURISDICTIONAL DISCOVERY. ......10

     1. Personal Jurisdiction Over The Defendant-Appellee Is Founded On Its Correspondence And Affidavit Showing The 'Substantial Revenue" It Derives From Its Weapons Sold In The United States And Illegally *Used* In The District Of Columbia, and Police 'Crime Weapons" Reports.

B. PERSONAL JURISDICTION SATISFIES DUE PROCESS
   GUARANTEES DUE TO THE INHERENT DANGEROUSNESS OF
   DEFENDANT'S-APPELLEE'S WEAPON PRODUCTS WHICH
   ILLEGALLY ENTER THE DISTRICT OF COLUMBIA AS 'CRIME
   WEAPONS', ONE OF WHICH WAS *USED* TO KILL J.H. ……… 17

C. REASONABLENESS FACTORS SUPPORT PERSONAL
   JURISDICTION IN THIS FORUM …………………………………….22


III. PLURALITY OPINIONS IN THE UNITED STATES SUPREME COURT
WOULD SUPPORT 'STREAM OF COMMERCE' JURISDICTION BASED
ON THE 'VALUE', 'VOLUME' AND THE 'HAZARDOUS CHARACTER'
OF DEFENDANT'S-APPELLEE'S ARMS SOLD 'UPSTREAM' IN THE
UNITED STATES. ……………………………………………………………. 24

IV. CONCLUSION …………………………………………………………… 32

# TABLE OF AUTHORITIES

<u>**CASES**</u> *                                                                              <u>**PAGE**</u>

*AFTG-TG, LLC v.Nuvoton Tech Corp.,* 689 F.3d 1358 (Fed.Cir.2012)… 30

*Allied Towing Corp. v. Great Eastern Petroleum Corp.,* 642 F.Supp.1339 (E.D.Va.1986) ………………………………………………… 19

\*Asahi Metal Indus. v. California,* 480 U.S. 102 (1987)…. 22, 28, 29, 30, 32

*Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558 (Fed. Cir.1994) …………………………………………… 14, 18

*Boone v. Oy Partek AB,* 724 F.2d 1150 (Del.1997) ……………………… 28

*Burger King v (Rudzewicz,* 471 U.S. 462 (1985) ……………………… 18

*Clemens v. McNamee,* 615 F. 374 (5th Cir.2011) ……………………… 9

*Crane v. Carr,* 814 F.2d 758 (D.C.Cir.1987) ………………… 15

*Delahanty v. Hinckley,* 688 F.Supp,920 (D.D.C. 1986) ……. 15, 16, 20, 21

\*District of Columbia v. Beretta,* 872 A.2d 633 (D.C. 2005) …………… 31

*El-Fadl v. Central Bank of Jordan,* 75 F.3d 668 (D.C.Cir.1996) ………… 10

*Ex parte DBI, Inc.,* 23 So.3d 635 (Ala.2009) ……………………… 15

*Fogle v. Ramsey Winch Co.,* 774 F.Supp.19 (D.D.C.1987) …………… 15-16

*Founding Church of Scientology v. Verlag,* 536 F.2d 424 (D.C.Cir.1976) 15-16

\*Greenwood v. FIAT, S.p.A.,et al.,* 617 F.2d 820 (D.C.Cir.1980) ……… 15,20

\*In re Totten Metrorail Cases,* 756 F.Supp.2d 132 (D.D.C. 2010) …… 20, 21

*Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945) …………………… 29

\*J.McIntyre Machinery, Ltd. v. Nicastro,* 131 S. Ct.2780 (2011)……………………………………………… 25, 26, 27, 30, 31

*Kollmorgan Corp. v.Yaskawa Elec.Corp.,*169 F.Supp.2d 530 (W.D.Va.1999) …………………………………………… 32

*Marks v. United States,* 430 U.S. 188 (1977)…………………………… 25

*Marshall v. Barlow's Inc.* (436 U.S. 307 (1976) ……………………… 18

*McIntosh v. Washington,* 395 A.2d 744 (D.C.App.1978) ……………… 20

*Metropolitan Life Insurance Co., v. Robertson-Ceco Corp.,*(2d Cir.1996) .. 32

*Milliken v. Meyer,* 311 U.S. 457 (1940) ……………………………… 18

\*MWANI v. BIN LADEN,* 417 F.3d 1 (D.C.Cir.2005) ………………… 10

*O'Neill v. Picillo,* 682 F.Supp.706 (D.R.I. 1988)……………………… 19

*Samatar v. Yousef,* 130 S.Ct.2278 (2010) ……………………………… 10

*United States v. Biswell,* 406 U.S. 311 (1977) ………………………… 18

*Uberti & C., v. Leonardo,* 802 P.2d 1354 (Ariz.1995) ………………… 22

*Velandra v. Regie Nationale des Usines Renault,* 336 F.2d 292 (6thCir.1964) ……………………………………………… 19

*Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534 (11th Cir. 1993) ……… 32

*World-Wide Volkswagon v. Woodson,* 444 U.S. 286 (1980) …………… 18, 32

*Young v.Marci,* 289 U.S. 253 (1933) ………………………………… 32

- Cases relied upon

## **STATUTES** **PAGE**

Foreign Sovereign Immunity Act…………………………………………… 9, 10
D.C.Code Section 13-423 (a) (4) …………………………………………… 19, 20
District of Columbia Assault Weapon Manufacturing Strict Liability Act . 17, 24

## **RULES**

Fed. R. Civ. Pro. 4 (e-f) …………………………………………………… 14

## **LAW REVIEW**

Lilly, *Jurisdiction Over Domestic and Alien Defendants*, 69 Va.L.Rev.85 (1983)
……………………………………………………………………………… 29-30

## GLOSSARY OF ABBREVIATIONS

1. FOREIGN SOVEREIGN IMMUNITY ACT (FSIA). 28 U.S.C. 1330 (a).

2. DISTRICT OF COLUMBIA ASSAULT WEAPON MANUFACTURING STRICT LIABILITY ACT (SLA). D.C. Code Sections 7-2551.01 (1) (A) and 7-2551.02.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The District Court of the District of Columbia had jurisdiction under DC Code Sec. 13-423 and 28 U.S.C. 1330(b) and 1605(a)(2) of the Foreign Sovereign Immunity Act (FSIA).

Appellate jurisdiction from the district court's order resides in 28 U.S.C. 1291. The district courts memorandum opinion and order was entered on February 4, 2012 in Civil Action No. 12-436 and the Plaintiffs'-Appellants' timely filed their appeal on February 7, 2012.

1

## STATEMENT OF THE ISSUES

1. Whether the U.S. District Court for the District of Columbia erred in granting Defendant's-Appellee's motion to dismiss due to lack of personal jurisdiction, without an evidentiary hearing and limited jurisdictional discovery, particularly where correspondence and local police crime weapon records showed that Defendant's-Appellee's, weapons were abundant in the District of Columbia, including the assault weapon used to kill J.H., sufficient enough for the Plaintiffs'-Appellants' to satisfy *prima facie* a showing of personal jurisdiction.

2. Whether the district court erred in its finding that the Due Process Clause of the Fifth Amendment to support personal jurisdiction was not satisfied based on its interpretation of U.S. Supreme Court holdings dealing with "stream of commerce" as it is applied to high volume sales by manufacturers and in particular, when the nature of Defendant's-Appellee's weapon products sold throughout the United States, are inherently dangerous and no identifiable controls were placed on their illegal entry into the District of Columbia as crime weapons.

## STATEMENT OF THE FACTS

J.H., represented by his parents, individually and as legal representatives, was one of five (5) juveniles killed, including a number who were injured, in a drive-by shooting in March 2010, by an AK-47 style weapon, identified as a ROMARM, SA WASR-10, and manufactured by the Defendant-Appellee. Defendant's-Appellee's, offer that the assault weapon was stolen from nearby Maryland before it entered the District of Columbia.

Local police reports show that forty-one (41) weapons manufactured by ROMARM illegally entered the District of Columbia, as crime weapons, during a five (5)year period preceding and commensurate with the date of J.H's death in 2010. Exh.A

Defendant-Appellee- ROMARM SA, is a world-wide arms merchant who sells its weapons and accessories through an independent U.S. distributor, identified by ROMARM's general manager and in newspaper reports, as Century International Arms or Century Arms International (Century). Exhs. B, 1-2; D, 1-2

According to the recent press report, ROMARM sells approximately five ($5) million dollars worth of armament annually to Century who apparently held an exclusive contract with ROMARM at the time of J.H.'s death in 2010. It is also reported in the same news article that ROMARM and Century have a "Business Promotion and Protection Agreement", where they both agree to "be loyal to each other" and to work jointly "to promote the sales of Romanian firearms and accessories in the United States." Exh. D, 1-2

3

Because of restrictive gun control policies, the District of Columbia has enacted one of the nation's strictest gun laws, passed by voting referendum in 1992. The law in effect is the Assault Weapons Manufacturing Strict Liability Act of 1992 (SLA), D.C. Code Sections 7-2551.01 (1) (A) and 7-2551.02. It is the keynote statute which underscores the theory of this case, along with theories of gross negligence and public nuisance.

Under the SLA, the "use" of an assault weapon manufactured by a foreign entity resulting in death or injury, with certain exceptions, not applicable here, the foreign manufacturer, or supplier of the weapon used is held to be strictly liable.

4

## SUMMARY OF THE ARGUMENT

Norman Williams and Diane Howe, as legal representatives of J.H., their son, are seeking damages, under the District of Columbia's Wrongful Death Act and Survival Act, for the death of their son, through the use of Defendant's-Appellee's (ROMARM's) manufactured weapon based on the District of Columbia's SLA and common law theories of gross negligence and public nuisance.

As required by the Foreign Sovereign Immunity Act, 28 U.S.C. 1330 (a), (FSIA) a foreign entity, even if state-owned, is vulnerable to suit in the United States, if its activity falls within one of the Act's exceptions. The most common of them being the "commercial exception".

This exception is operative when the foreign entity's activity is by its "nature" an activity ordinarily carried out by a private actor. Defendant'-Appellee's marketing and sale of weapons world-wide fits the construct of the "commercial exception" of the FSIA. The district court's Memorandum Opinion is in accord, as it made a "due process" finding based on the exception denying personal jurisdiction based on a lack of due process.

The district court did *not* conclude that ROMARM is itself a foreign state, thereby granting it sovereign immunity status, or any other FSIA's exceptions, which may not necessitate "due process" considerations.

Moreover, in its role as a "private actor", ROMARM, is granted due process guarantees (besides the reach of the local long-arm statute) necessary for the district

5

court to assert personal jurisdiction. However, no evidentiary hearing was held, nor was limited jurisdictional discovery allowed to assist in determining whether personal jurisdiction existed.

Instead, Plaintiffs-Appellants were relegated to their jurisdictional argument based only on correspondence and an affidavit of ROMARM's general manager. Also included were local police records depicting the high volume and consistent rate of entry of ROMARM's inherently dangerous weapons into the District of Columbia during the period encompassing J.H.'s death.

Based on this *prima facie* showing of personal jurisdiction, sufficient "minimum contacts" were shown, based on non-evidentiary documentation, leaving the ultimate burden by Plaintiffs'-Appellants' to prove due process as evidence is later brought forth in the liability phase of the action.

The district court's denial of personal jurisdiction on due process grounds, was based on its interpretation of the Defendant's-Appellee's "stream of commerce" sales into the U.S. market, based on U.S. Supreme Court holdings, which it found to be unavailing.

Plaintiffs'-Appellants', argue that the recent plurality opinion in *J. McIntyre, Ltd., v. Nicastro* based on the high court's precedent found in *Asahi Metal Indus. v. California* auger for personal jurisdiction based on the "value", "volume", and the "hazardous character" of the product in the "stream of commerce".

The above Supreme Court opinions, and other opinions supporting jurisdiction

6

are based on a facts similar to the instant case where inherently dangerous products are illicitly "used" in a forum which bans them.

Personal jurisdiction is given further leverage due to the Defendant's-Appellee's "substantial revenue" at issue. It is reported to make annual sales of five ($5) million dollars, yet without the adequate controls on the marketing and sales of its weapons to prevent them from illegally crossing over into forums where their sale is illegal.

The fact that ROMARM sells its products to independent domestic arms dealers is of little consequence due to the "upstream" movement from wholesalers to retailers, making it highly "foreseeable", if not probable, that its products will, by its attractive nature to criminals and others, crossover into forums, such as the District of Columbia where they are prohibited.

7

## RULE 32 CERTIFICATION

1.  This brief complies with the type-volume limitation of the Federal Rule of Appellate Procedure 32(a)(7)(B) because:

This brief contains 4204 words, or less, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

2.  This brief also complies with the typeface and type-style requirements of FRAP 32(a)(5) and 32(a)(6) because:

This brief was prepared in a 14 point Time Roman font.

8

# ARGUMENT

## II.  THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA ERRED BY GRANTING DEFENDANT'S-APPELLEE'S MOTION TO DISMISS BASED ON LACK OF PERSONAL JURISDICTION, WHICH AS AN ISSUE OF LAW IS REVIEWED HERE *DE NOVO.*

Whether personal jurisdiction can be exercised over the defendant-appellee is an issue of law which is reviewed *de novo. Clemens v. McNamee,* 615 F.3d 374, 378 (5th Cir.)

Appellants filed this case against a foreign corporation through the Foreign Sovereign Immunity Act (FSIA). 28 U.S.C. Sec. 1330 (a). The FSIA provides statutory authority for personal jurisdiction once there is a finding of subject matter jurisdiction and service of process. 28. U.S.C. Sec. 1603 (a). The latter is not an issue on appeal and subject matter was virtually conceded by the parties, as the appellee, by selling arms, is engaged in "commercial activity" in the "nature" of a private party, within one of the common exceptions to foreign government sovereign immunity. Subject matter jurisdiction was not reached by the district court, as unnecessary, based on its dismissal for personal jurisdiction.

Appellee, however, argued in the alternative, that because, ROMARM, is state owned it should be found immune from subject matter jurisdiction. Appellants maintain that ROMARM's activity falls within the foreign sovereign immunity exception due to the "nature" of the private entity in selling arms world-wide. 28 U.S.C. Section 1605 (a) (2).

9

Appellee's insist, that if it is in fact, a "commercial activity" exception, it qualifies as a "person", thereby guaranteed Due Process Clause protection through the Fifth Amendment.

### A. PLAINTIFFS'-APPELLANTS' BORE ONLY A *PRIMA FACIE* BURDEN TO SHOW PERSONAL JURISDICTION DUE TO THE LACK OF AN EVIDENTIARY HEARING AND DENIAL OF ATTEMPTED JURISDICTIONAL DISCOVERY.

#### 1. Personal Jurisdiction Over Defendant-Appellee Is Found From Its Correspondence And Affidavit Showing The 'Substantial Revenue' It Derives From Its Weapons Sold In The United States and Illegally 'Used' In The District Of Columbia From 'Crime Weapons Reports'.

"In the absence of an evidentiary hearing, although the plaintiffs retain 'the burden of proving personal jurisdiction, [they] can satisfy that burden with a *prima facie* showing.' " (cits.om.) *MWANI v. BIN LADEN,* 417 F.3d 1, 7 (D.C.Cir. 2005). ("Moreover, to establish a *prima facie* case, plaintiffs are not limited to evidence that meets the standards of admissibility ... Rather, they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." (ftn.cits. om.) Also, *El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 676 (D.C. Cir. 1996), *abrogated on other grounds by Samatar v. Yousef,* 130 S. Ct. 2278 (2010).

Plaintiffs'-Appellants' satisfied their *prima facie* burden for personal jurisdiction (in which formal discovery was denied), based on October 25, 2011 correspondence from ROMARM's general manager's in Bucharist, after it was served process, that it sold "weapons for civil use for legal entities-traders based in the U.S." Exh. B, at

10

General Manager, Vasile Marius Crisen, later filed an affidavit in response to this law suit, on December 6, 2011, acknowledging "that the incident rifle was sold on or about 2008 … to CENTURY INTERNATIONAL ARMS, INC/CENTURY ARMS." Exh C,

Century Arms International (Century), according to a recent article appearing in the Rutland Herald, a Vermont newspaper, dated February 7, 2013, stated that Century purchases, on average, $4.2 million dollars worth of weapons annually from ROMARM at the rate of $350,000 per month. Exh. D.

In the same article, covering a lawsuit Century has filed against a competitor who is in competition with Century to purchase ROMARM weapons, it cites that in Century's complaint that ROMARM and Century have a "**Promotion and Protection Agreement**" whereby the companies agree to "be loyal to each other" and to work *jointly* "to promote the sales of Romanian firearms and accessories in the United States." Exh. D.

In further support of personal jurisdiction, without discovery, Plaintiffs-Appellants offered for evidence a local police crime report (from the Metropolitan Police Department), revealing that forty-one (41) crime weapons, manufactured by ROMARM, were traced to the District in less than four (4) years from the period of March 2007 to December 2011, which encompasses the period of J.H's death with four (4) other juveniles in March 2010. *EXH. A*

This reports supplies irrefutable proof that a sizable volume of illegal weapons

from ROMARM's distributor, Century, enter the District illegally, at the rate of almost one a month for nearly four (4) years, where they are prohibited. Although its weapons cannot be sold in this forum, ROMARM takes advantage of sales just beyond the forum as part of its nationwide marketing scheme, indirectly allowing a sizable share of its deadly products to pervade the District market. Once here, they are "used" in criminal activity to kill and maim its victims. No evidentiary hearing was ever held by the district court to review the tentative evidence supporting plaintiff's showing of personal jurisdiction.

Plaintiffs'/appellants' were denied jurisdictional discovery, as a second factor supporting a *prima facie* basis for personal jurisdiction. Appellants filed Interrogatories with the defendant/appellee, after conferencing, but were blocked by its motion for a protective order sanctioned by the court. Appellants were attempting to learn more about the size of defendant/appellee's marketing scheme in the United States and what controls were placed on it to prevent its dangerous products from being used by the criminal element, particularly in this forum. Yet, a principal district court concern was that the "allegation does not relate to any legitimate and purposeful contacts with the District of Columbia." Mem. Opin., at 19.

Defendant, ROMARM, has not disputed the general statements presented above. Neither has the defendant disputed Metropolitan Police Department crime weapons records reported in opposition to its motion to dismiss, namely that its crime weapons sold elsewhere, often wind up as crime weapons *in* the District.

12

Lamentably, jurisdiction is turned on its head if appellants must show

"legitimate" and "purposeful" legal activity to survive a jurisdictional challenge as the

weapons at issue cannot be sold here and therefore have no "legitimacy" here. Instead,

jurisdiction is justifiable based on the volume of ROMARM's weapons sold in the

United States, and what steps it has taken, through its "exclusive" distributor, based on

its **Promotion and Protection Agreement,** to control them once they reach their

retailers, thus preventing their illegal access here.

An example of one of the twenty-one (21) Interrogatories proposed and denied by

the court, exemplifies plaintiffs' attempts to learn about controls placed on the after sale

of the defendant's dangerous product:

> **Int. No. 12.** How many of your weapons, no matter who introduced
> them into the US market, do you believe have been lost or stolen in
> the past ten (10) years, and what steps have you taken there or here,
> with your distributors, to take precautions to prevent such loss or
> theft and/or produce records of same. How many of your weapons
> were used in criminal activity in the past ten (10) years from your
> belief and knowledge.

The obvious aim of such discovery is to determine, exactly what the volume of

weapons sold by ROMARM are in the US market; what the criminal use of its weapons

are after being sold; and, what precautions are in place dealing with (a) oversell in states

bordering on illegal sales areas; (b) supervision over retailers who may have

background check violations, or stolen weapons; and (c) sales made at gun shows,

by retailers who are sold ROMARM products, if no background checks are made.

Personal jurisdiction must satisfy: (1) District of Columbia's long-arm statute,

13

and (2) the Due Process Clause.

The FSIA's long-arm statute is already modeled on the District's statute. 28 U.S.C. 1330 (b) and its "commercial exception" at section 1605(a) (2). Otherwise, the FSIA normally relies on the long-arm statute of the forum, as FSIA operates under federal "diversity" rules. Normally, federal matters apply the forum's long-arm statute to determine whether personal jurisdiction exists. *See* Fed. R. Civ. Pro. 4(e-f); *Beverly Hills Fan Co.v. Royal Sovereign Corp.*, 21 F.3d 1558, 1569 (Fed.Cir.1994). The District's long-arm statute reads as follows, in pertinent part:

> (a) A federal court here may exercise personal jurisdiction over a person, who may exercise who acts directly, or by an agent, as to a claim for relief arising from the person's …
> (4) causing tortuous injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods *used* … in the District of Columbia. (emphasis added)

D.C. Code Section 13-423 (1989).

This Circuit holds that Section 13-423(a) (4) of the District's long-arm statute is not as broad as the Due Process Clause, thus requiring a "plus factor" to "filter out cases in which the inforum impact is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum." *Crane v. Carr*, 814 F.2d 758 (D.C. Cir. 1987). This "plus factor", or the due process clause guarantee, is reviewed in the next section.

The "substantial revenue" component in the long-arm statute does not equate solely with the "idea of commercial impact on the forum with the narrower concept of financial gain or loss in the forum." *Delahanty v. Hinckley,* 686 F.Supp. 920, 925

14

(D.D.C.1986) (The "commercial impact" on the District in *Delahanty*, for example, was found sufficient for jurisdictional purposes, without having to show gun sales profit or loss.) at 927.

   This Circuit has also held that the test for "substantial revenue" "looks both at the absolute amount and at the percentage of total sales, and determines what is 'substantial' on the facts of each case." *Founding Church of Scientology v.Verlag,* 536 F.2d 424, 433 (D.C.Cir.1976).

   " '[S]ubstantial revenue [is] enough revenue to indicate a commercial impact in the forum, such that the defendant fairly could have expected to be hauled into court here.", at 136, cit. to *Delahanty, supra,* at 925. "[T]he test for substantial revenue 'looks both at the absolute amount and at the percentage of total sales, and determines what is substantial on the facts of the case.' " *Fogle v. Ramsey Winch Co.,* 774 F.Supp. 19, 23 (D.D.C.1987) (quoting *Founding Church of Scientology v. Verlag,* 536 F.2d 429, 433 (D.C.Cir.1987).

   *Delahanty* goes further in that "[t]he Court must focus on the 'quality, quantity and *nature* of contacts … taken in the aggregate …" at 925 (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945) (emphasis in original)

   Instructive for commercial impact in tortious injury cases is *Gatewood v. FIAT, S.p.A., et al.,* 617 F.2d 820, 825 (D.C.Cir. 1980), arising out of an automobile accident for injuries occurring in the District, brought against a manufacturer and distributor from outside the District. The defendants had no offices, agents, or dealers, but there

15

were sales and service agencies located nearby in the state of Maryland where the car was purchased.

Only two (2) percent of the distributor's total revenue was produced by sales in the entire D.C. area. How many of their cars were "used" in the District was unknown. However, the sales total of the defendants from the nearby state were found to be more than adequate to constitute "substantial revenue" under the District's long-arm statute and establish personal jurisdiction as to the accident and injury which occurred here. As well, *FIAT* found that "[t]he statute does not require that the goods be *sold* in the District of Columbia." (emphasis in text), at 827.

*FIAT* "recognize[d] the District's interest in preventing defective products from crossing its borders and causing injury on its roads, or in its workplaces, or dwellings … Fiat and Fiat Motors each knew that many of the automobiles would be used in the District of Columbia, and they derived substantial revenue from sales of those automobiles [in nearby Maryland]" at 827-28.

Similarly here, where gun are sold to states bordering the District and are then "used" illegally in the District, once transported here. If forty-one (41) ROMARM weapons arrive in the District, over a period of less than four (4) years, the rate of entry is at least on a pace of nearly one a month which has not only a commercial, but a dangerous impact here.

If appellee's weapon sales in the U.S. were spread evenly throughout the fifty (50) states, approximately $84,000 of its $4.2 million in annual sales takes place in the

16

state of Maryland where the incident weapon reportedly came from.

Moreover, it is normal that the market for legal weapons tends to expand in states nearby those areas where there is an inability to sell them. Increased sales to the bordering legal states compensates for straw purchases and illicit trafficking to the nearby gun-restricted area, such as the District.

Because of the frustration to protect its borders, the District fashioned the nation's strictest gun law (by referendum) to punish manufacturers and distributors of assault-style weapons which are "used" here. It was the District's belief that extraordinary steps had to be taken to curb violence emanating from legal sales outside its border.

The statutory omen for the claims brought in this case reflects District's attempts to fairly warn negligent merchants, whose weapons are trafficked here, that they are held accountable through its Assault Weapons Manufacturing Strict Liability Act of 1992 (SLA), D.C. Code Sections 7-2551.01 (1)(A) and 7-2551.02, besides the common law claims of gross negligence and public nuisance.

## B. PERSONAL JURISDICTION SATISFIES DUE PROCESS GUARANTEES DUE TO THE INHERENT DANGEROUSNESS OF DEFENDANT'S-APPELLEE'S WEAPON PRODUCTS, WHICH ILLEGALLY ENTER THE DISTRICT OF COLUMBIA, AS 'CRIME WEAPONS', ONE OF WHICH WAS *USED* TO KILL J.H.

"The Due Process Clause requires that, in order to subject a defendant who is 'not present within the territory of the forum' to personal jurisdiction, the court must first make sure that this party 'ha[s] certain minimum contacts ... such that the maintenance of the suit does not offend traditional notions of justice and fair play". *Milliken v.*

17

*Meyer,* 311 U.S. 457, 463 (1940).

As it was originally set down, in order to give non-residents, or foreign

defendants "fair warning" that a given activity subjects them to suit in the forum, these

"minimum contacts" must be purposeful." *Id; See Burger King v. Rudzewicz,* 471 U.S.

462, 472 (1985). Such contacts with the forum must be of a kind that would cause the

defendant to "reasonably foresee" that it might be "haled before a court" in the forum.

*Id; World-Wide Volkswagon v. Woodson,* 444 U.S. 286, 297 (1980).

Finally, "even if the requisite minimum contacts have been found through an

application of the ['[']stream of commerce['] theory or otherwise, if it could be

unreasonable for the forum to assert jurisdiction under all the facts and circumstances,

then due process requires that jurisdiction be denied." *Beverly Hills Fan, supra,* 21 F.3d

at 1568.

Due Process, besides "minimum contacts", as the second prong of the jurisdiction

test not only requires (1) "minimum contacts", but has a second prong itself: (2) fairness

to the defendant.

Also, it precedent law is increasingly acknowledging that the "nature" of a

product may also have a bearing on the issue of minimum contacts and fairness.

"[W]here a defendant deals in [] inherently dangerous products, a lesser showing that is

ordinarily required will support jurisdiction." *Velandra v. Regie Nationale des Usines*

*Renault,* 336 F.2d 292, 298 (6th Cir. 1964).

"[A] commercial defendant who deals in handguns should expect to be held

18

accountable on a lesser showing than one who sells something as harmless as rubber

bands. It is the type of product that in which the state will have an inherent interest."

*Delahanty, supra,* at 925. [DC Circuit]

Further, the scope of "foreseeability" is broader when the enterprise giving rise

to the action is subject to persuasive federal regulation. *Allied Towing Corp. v. Great*

*Eastern Petroleum Corp.,* 642 F.Supp. 1339, 1356 (E.D.Va.1986); *see also O'Neil v.*

*Picillo,* 682 F.Supp. 706, 718 (D.R.I. 1988; *cf. Marshall v. Barlow's Inc.,* 436 U.S. 307,

314 (1978) ("businessmen engaged in [] federally licensed and regulated enterprises

accept the burdens as well as the benefits of their trade … The businessman in a

regulated industry in effect consents to the restrictions placed upon him."; *United States*

*v. Biswell,* 406 U.S. 311 (1972) (finding the sale of firearms to be an industry of the type

discussed in *Barlow*); *Delahanty, supra,* (personal jurisdiction could be properly

exercised over the nonresident manufacturer and distributor of a crime gun that

*illegally* entered the District of Columbia even though neither the manufacturer, nor the

distributor, had agents or offices in the District and neither was licensed to do business

in the District.)

*Delahanty* brought out the fact that printouts from the Bureau of Alcohol,

Tobacco and Firearms [now BATFE] and the Metropolitan Police Department,

irrefutably show the extent to which the defendants' products were illegally trafficked

and used by criminals, holding the appellee to a *reasonable awareness* standard where

the sold weapons wind up. This would "support a finding that 'defendants' nationwide

19

distribution scheme [had] been successful in indirectly distributing large numbers of their handguns in the District of Columbia." at 921

This court, in *Delahanty*, rejected defendant's argument that it had not "purposefully availed" itself of the District of Columbia market. It held that it did not "matter that defendants' product reached the jurisdiction *indirectly*, so long as they [had] not sought to curtail their access to this market." *Id. at 923*. (emphasis added) Federal regulatory persuasiveness is found through the licensing of federal firearms distributors, wholesalers and retailers, a/k/a ("FFL's").

Recently, in this circuit, *In Re Totten Metrorail Cases,* 756 F.Supp.2d 132 (D.D.C. 2010), held that where circuit boards introduced into the District's WMATA system, were found to be "defective and/or unreasonably dangerous", the district court looked to *Delahanty, supra,* for jurisdiction based on "foreseeability".

The *Totten* court further established, citing *Delahanty,* "the District of Columbia's long-arm statute does not require that the manufacturer … have sold [a product] *directly* in the District." *Delahanty,* 686 F.Supp. at 925 (citing *Gatewood v. FIAT, S.p.A.,* 617 F.2d 820, 827 (D.C.Cir. 1980). (emphasis added).

As *Delahanty* eloquently explains, jurisdiction is not unavailable simply because gun manufacturers are prohibited from selling their weapons in the District. "By enacting laws to protect its citizens from gun-related crimes, *see McIntosh v. Washington,* 395 A.2d 744, 754 (D.C.App. 1978), the District did not forfeit its interest in providing a forum in which to hold manufacturers and distributors guns answerable

20

for injuries occurring within its borders." *Delahanty, supra,* at 923-24.

The federal court here held in *In re Totten,* that despite the defendant's sworn affidavit in which the company president (ADCO) "explicitly denies any knowledge that his company's products would end up in equipment that was ultimately sold to WMATA ... is not the issue. ... [Plaintiff's contention was that] ADCO knew or *reasonably should have known* that their circuit boards would end up being used by WMATA in the District of Columbia." at 137-38. (emphasis in original). Jurisdictional *discovery* was ordered so that the "value" of the sales and percentage of total revenue derived from sales could be known to decide the due process component of personal jurisdiction. at 138. (emphasis added)

State supreme court case holdings in wrongful death and defective product liability actions find personal jurisdiction due to the greater concerns of the forum in protecting its citizen based on a product's dangerousness. *Ex parte DBI, Inc.,* 23 So.3d 635, 654-55 (Ala.2009) (In a wrongful death action in Alabama, plaintiff sued the Korean manufacturer of an allegedly defective seatbelt; the Alabama court held the manufacturer amenable to suit in Alabama, although the manufacturer in Korea had supplied the seatbelts to the car maker in Korea and "maintain[ed] there [was] no evidence ... showing that it knew its products were being marketed in Alabama."

Similarly, in *Uberti & C., v. Leonardo,* 802 P.2d 1354, 1362 (Ariz1995), a wrongful death action against the Italian manufacturer of an allegedly defective handgun that caused a child's death, the state supreme court concluded: "[F]or all the

21

record shows, Defendant never heard of Arizona. This raises the following question: Having shown that the gun was knowingly designed for and exported to exploit the United States or western market, must Plaintiffs additionally show that Defendant had the specific intent to market the gun in Arizona, or is it enough to show that Defendant intended to market it in *any* state, group of states, or *all* states? We conclude that only the latter is necessary." (emphasis added)

## C. REASONABLENESS FACTORS FOR PERSONAL JURISDICTION IN THIS FORUM

Five factors, arising out of *Asahi Metal Indus. V. California,* 480 U.S. 102, 113 (1987) (plurality) aid in determining whether an assertion of jurisdiction is reasonable: (1) the burden on defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; (5) the shared interest of individual states and the interstate or international community in furthering their appropriate substantive social policies.

Due process considerations intertwine. Fewer contacts may be necessary where the "reasonableness" factors weigh heavily in favor of an exercise of jurisdiction. *See Metropolitan Life Insurance Co., v. Robertson-Ceco Corp.,* 84 F.3d 560, 568 (2d Cir. 1996) ("A court deciding whether it has jurisdiction over and out-of-state defendant under the Due Process Clause must evaluate the 'quality and nature' of the defendant's contacts with the forum state under a totality of the circumstances test." (cit,om.)

22

Three (3) of the "reasonableness factors" above are particularly applicable here for weighing due process over a foreign corporation:

(1) Defendant's burden: Obviously, ROMARM, which is a major arms manufacturer and distributes throughout the United States benefits from its $4.2 million dollar reported annual sales in the United States. But to incur such benefits is to incur the burden as well, especially as to risks involved in engaging in inherently dangerous products and its ability to indemnify itself against defective or use of its weapons where prohibitively used.

Further, ROMARM, has shown substantial involvement in interstate commerce in the United States. Moreover, its activity, if it lacks controls over its dangerous product, there is greater public interest in protecting those who are victims of failure to curtail its activity in the forum area. The safety of an entire community is at stake if appellee's assault weapons are arriving in the District at the rate they are reported. Exh. A

(2) States interest: The forum must have an "appreciable interest", that is, to vindicate its strict local policies for keeping illegal weapons at bay, it serves notice to all gun sellers that it maintains the nation's strictest law (SLA) finding manufacturers liable if its assault weapons wind up here and used for their designed purpose. *See Vermeulen v. Renault USA, Inc.,* 985 F.2d 1534, 1551 (11th Cir.1992) (The United States has a manifest interest "that this case be heard in this country given that it has a compelling interest in protecting persons within its border from unsafe products which find their way into the country.")

(3) Plaintiffs' interest: Since there are no alternative forums in the United States to hear their case, the plaintiffs would be forced into a foreign country forum which runs a real risk that Romania would not consent to a choice of the law applicable to the District's SLA and would most likely be biased in favor of its own industry.

The evidentiary problem going overseas would be massive. Up to three (3) victims of ROMARM's weapons may be represented here. Medical testimony from personnel and records would logically come from nearby hospitals in this forum for claims in wrongful death, Survival Act and injuries. The weapon, at issue, by law, must remain in the custody of the local police department for sixty-five (65) years following the murders in 2010. How the weapon could be transported to Romania, as evidence, with the substantial costs of police personnel would be prohibitive, besides the clearance necessary to have a weapon board an airline.

### III. PLURALITY OPINIONS IN THE UNITED STATES SUPREME WOULD SUPPORT 'STREAM OF COMMERCE' JURISDICTION BASED ON THE 'VALUE', 'VOLUME' AND THE 'HAZARDOUS CHARACTER' OF DEFENDANT'S-APPELLEE'S ARMS SOLD 'UPSTREAM' IN THE UNITED STATES

The district court targeted *J.McIntyre Machinery, Ltd. v. Nicastro,* 131 S. Ct. 2780 (2011) (plurality opinion), the latest case from the United States Supreme Court interpreting the "stream of commerce" theory to deny personal jurisdiction. J. McIntyre Machinery, Ltd., a British company, manufactured and sold metal shearing machines, to a U.S, distributor in Ohio. It later sold a single metal cutting machine to a scrap metal company in New Jersey, in which the machine later amputated several of Nicastro's

24

fingers due to an allegedly missing, or defective, protective device. .

The high Court's *Nicastro* plurality, denied stream of commerce personal in the New Jersey forum based on a split decision among the Justices in which no majority was reached. Reasoning of a Supreme Court opinion that does not command a majority vote is not binding precedent. *See CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 81 (1987).

Instead, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices , 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Marks v. United States,* 430 U.S. 188, 193 (1977) quoting *Gregg v. Georgia,* 428 U.S. 153, 169n (opinion of Stewart, Powell and Stevens, JJ).

In *Nicastro,* Justice Breyer, joined by Justice Alito, in their concurring opinion, furnished the narrowest grounds and thus is controlling. Justice Breyer explained that in none of the Court's precedents does "a single isolated sale" provide an adequate basis for personal jurisdiction. at 2792. Justice Breyer's concern in *Nicastro* was that New Jersey cast its net too broad to "rest jurisdiction" on any product liability in a forum "no matter how few the numbers of items end up in the particular forum at issue." at 2793.

Justice Breyer criticized the four (4) Justice plurality (written by Justice Kennedy) that it applied an overly stringent view of personal jurisdiction, that a court could only assert jurisdiction in cases when the defendant submitted to a state's sovereign power. Justice Breyer asserted that "[t]here may well have been other facts that Mr. Nicastro

25

could have demonstrated in support of jurisdiction. And the dissent considers some of those facts." *Nicastro,* at 2793

Justice Breyer's major concern was that small-sized companies may find themselves defending in faraway forums where its products happened to be unknowingly distributed. Besides, there also appeared to be an alternative forum in *Nicastro,* in Ohio, where the allegedly defective machine was sold to the British manufacturer's distributor.

Obviously, based on the factual predicate that only one machine was sold in *Nicastro,* contrasts greatly to the factual predicate here where forty-one (41) ROMARM's weapons were reported to have reached the District, during a period when one of them was *used* to kill five (5) juveniles. Not only are the facts here (of 41 weapons ) a far cry from the single sale in New Jersey in *Nicastro*, but additionally, the dangerous propensity of the products and the inability to keep such lethal weapons, which are federally governed, out of illegitimate hands weighs favorably for jurisdiction.

Here there is a discernable pattern of illegal weapons from nearby ROMARM sales outlets unmistakably landing as crime weapons in the District on a one-a-month, basis over a nearly four (4) year period which should have reasonably placed ROMARM on notice that something has gone drastically wrong with its sales to upstream wholesalers and retailers in this country.

The failure of the *Nicastro* court to find a majority consensus places a greater

26

precedence for "stream of commerce" jurisdiction back to *Asahi,* where Justice

Brennan, in a another plurality opinion with four (4) concurring Justices, held that the

benefits received by a manufacturer who starts the movement of its products upstream

(i.e., wholesalers to retailers) are found sufficient to establish the "minimum contacts"

necessary wherever its product is later found to do damage. At 117

While another four Justices, in *Asahi,* (in an opinion by Justice O'Connor)

decided that an additional factor was needed to establish jurisdiction through "stream of

commerce", i.e., "purposeful availment". Justice Stevens, and two (2) other Justices in

*Asahi,* "[saw] no reason in this case for the plurality to articulate 'purposeful direction'

or any other test as the nexus between an act of a defendant and the forum State that is

necessary to establish minimum contacts."

The narrowest plurality decided by Justice Stevens and his colleagues

criticized Justice O'Connor's plurality "that an unwavering line can be drawn between

'mere awareness' that a component will find its way into the forum State and

purposeful availment' of the forum's market." at 122

"Whether or not this conduct rises to the level of purposeful availment requires a

constitutional determination that is affected by the volume, the value and the *hazardous*

character of the components." at 122 (emphasis added)

What can be gleaned from these "stream of commerce" cases, pertinent here, is

that the potentially dangerous tire component in *Asahi* that caused a death from a

defective tubing component, would ordinarily be sufficient to establish the necessary

27

"minimum contacts" based on the opinion of five (5) Justices on the narrowest ground. at 122. Plaintiffs-Appellants are supported by Justice Stevens' narrow contingent that "contacts" are more discernable when there was "value", "volume" and a *hazardous* character to the products set in to the stream of commerce. at 122. (emphasis added)

Thousands of Asahi tire components were sold on the world market and Asahi received the sales benefits, as an upstream manufacturer tracking its parts to California, where one of its component parts exploded in a motorcycle tire throwing the rider to his death.

The case was only denied jurisdiction in California because the primary plaintiff and Asahi's distributor had settled the case beforehand. The case before the Supreme Court dealt with indemnification to the third-party plaintiff-distributor (a foreign company itself) against Asahi in Japan. The forum's interest in California's was too tenuous involving a foreign third-party plaintiff and a foreign defendant. at 1034.

Of consequence here, distinguishing *Asahi,* is a resident plaintiff in a local forum suing a nonresident foreign defendant for injuries when no other U.S. forum appears to be available, only the forum of a foreign country, Romania.

Implicit in *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny, is the assumption that the plaintiff must always have available at least another domestic forum which to sue a non resident defendant. *See,* Lilly, *Jurisdiction Over Domestic and Alien Defendants,* 69 Va.L.Rev. 85, 124 (1983)

On any reasonable and level of fairness, if a plaintiff is exposed to danger in his

28

home forum he should not be required to seek relief in a foreign country as this too would not be consistent with appellants' own due process rights. *See Boone v. Oy Partek AB,*724 A.2d 1150, 1161 (Del.1997)

Whereas, in Justice Stevens' narrow three-Justice concurrence in *Asahi,* the least common denominator basis for jurisdiction involving "value", "volume" and the "hazardous character" of the product causing the injury meets the jurisdictional standard here where dangerous products are shipped to this country with its primary purpose to promote and sell weapons to all states without a strategy for preventing their transfer and "use" to an illegal forum. Those manufacturers who benefit from the nationwide sale of weapons in the United States must also bear the risk where they are prohibited.

One such weapon as used here, an AK-47 semi-automatic style weapon, with up to a 30 round magazine, has the capacity in the hands of an untrained "owner", to mow down numerous victims in a matter of seconds goes far beyond the damage a defective component caused in *Asahi.* And far beyond the damage done by a defective product sold in *Nicastro.*

Yet here, the "value", "volume" and "hazardous character" of a product under the Justice Stevens or Justice Breyer's plurality standard is availing for "minimum contacts" and "foreseeability" purposes to merit personal jurisdiction.

Justice Ginsburg's dissenting opinion (with two 2 other Justices) in *Nicastro* is telling:

29

> Is it not fair and reasonable … to require the international seller
> to defend at the place its products cause the injury? … On what
> measure of reason and fairness can it be considered undue to re-
> quire [J. McIntyre] to defend in New Jersey as an incident of its
> efforts to develop a market for its industrial machines anywhere
> and everywhere in the United States? *Nicastro,* at 2804

"Foreseeability" is more easily assigned to ROMARM than it was in *Nicastro*, in

that not <u>one</u> product has entered this jurisdiction. Where in contrast, at least forty-one

(41) abnormally dangerous weapons, designed to kill, have entered the District illegally

in less than a four (4) year period, either stolen from nearby retailers, or illegally sold to

"straw man" purchasers, without any discernable argument or proof on the part of the

Defendant's-Appellee's that measures are taken to curtail their illegal activity, thus

forcing upon the District of Columbia forum the enforcement of its laws as a

consequence to such illegal activity occurring here.

The Federal Circuit has addressed the narrow holding in *Nicastro.* In *AFTG-TG,*

*LLC v Nuvoton Tech Corp.,* 689 F.3d 1358, (Fed. Cir. 2012), the Supreme Court's

framework applying the stream-of-commerce theory – including the conflicting

articulations of that in [*Asahi*] had not changed, and that the defendant's activities in

[*Nicastro*] failed to establish personal jurisdiction under any articulation of that theory."

"[t]he narrowest holding is that which can be distilled from Justice Breyer's

concurrence – that the law remains the same after [*Nicastro*]." At 1363

The District's highest court in *District of Columbia v. Beretta,* 872 A.2d 633, 658

(D.C. 2005) has also established a precedent for stream of commerce jurisdiction: "A

30

person who sets in motion in one State the means by which injury is inflicted in another may, consistently with the due process clause, be made liable for that injury whether the means employed be a responsible agent or irresponsible instrument." cit. to *Young v. Masci*, 289 U.S. 253, 258 (1933)

The appellee's chief defense against the stream of commerce doctrine is that it sells its weapons to an independent distributor in Romania before they are exported to the United States, where they are modified to meet federal regulations for the US market. Exh. B Thus, ROMARM is in the dark as far as knowing where they are marketed.

*Kollmorgan Corp. v. Yaskawa Elec.Corp.,* 169 F.Supp.2d 530, (W.D.Va. 1999) found that the ostrich head in the sand theory is not credible. "It is untenable under law." "While it may well be true that … takes steps to keep itself in the dark about … marketing strategies, it cannot do so to escape jurisdiction. 'The court may make the reasonable inference that the sale of a large number of devices to a firm with a nationwide distribution network will generally result in the sale-or at least the use-of one of those devices in the forum state.' " at 534

Obviously, it is not feasible for the foreign manufacturer, *per se,* who never enters the country, have the physical presence for "minimum contacts" with the forum state, especially when it structures its sales scheme through an independent distribution system here in the United States. *See Asahi, supra,* at 116.; *See also, Worldwide Volkswagon Corp. v. Woodson,* 444 U.S. 286, 298-99 (1980).

31

One circuit, commenting on the detachment of foreign companies from tortuous claims which start outside the US border, finds that the United States has a manifest interest "that this case be heard in this country given that it has a compelling interest in protecting persons within its border from unsafe products which find their way into the country." *Vermeulen v. Renault, U.S.A.,Inc.,* 985 F.2d 1534, 1551 (11th Cir. 1993).

## IV. CONCLUSION

As no evidentiary hearing has been held and jurisdictional discovery was denied, appellants' have only the need for a *prima facie* showing of jurisdiction. This they done through their documentation. The ultimate burden of satisfying jurisdiction awaits further proof in the evidentiary stage. As there appears to be no alternative jurisdiction in the United States and court precedent is not to send local cases to a foreign tribunal for trial, there is but a fallback choice to have the case be heard here.

Moreover, the inherently dangerous product at issue in this case is of the type in which the District's has an inherent interest. The Plaintiffs-Appellants have a due process rights to be heard within the US court system. The district court's dismissal based on personal jurisdiction must be reversed and the case mandated for trial.

Respectfully submitted,

Daniel Wemhoff, esq. #420233
4600 S. Four Mile Run #831
Arlington, VA 22204
(703) 589-2199
e-mail:danwem@yahoo.com

32

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Appellant's Brief was mailed to attorneys for the appellee, ROMARM, at their respective addresses and e-filed on this date, the 7TH OF AUG, 2013

Daniel Wemhoff